1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**ERIC G. CAMPBELL,**

                    Petitioner,

v.

**MACK JENKINS,** *et al.,*

                 Respondents.

)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 14-CV-2837-WVG

**ORDER DENYING FIRST AMENDED PETITON FOR WRIT OF HABEAS CORPUS**

**[DOC. NO. 4]**

**I.**

**INTRODUCTION**

     Eric G. Campbell ("Petitioner"), has filed a First Amended Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254 challenging his jury conviction for one count of felony resisting an executive officer under California Penal Code § 69, and one count of misdemeanor resisting an officer under California Penal Code § 148(a)(1)). (Doc. No. 4; Lodgment 2 at 94–95.) Petitioner asserts two grounds for relief, both of which were raised on direct appeal in state court. (Doc. No. 4 at 2, 6–9;

14-CV-2837

1    Lodgment 3.)   Respondent's Answer concedes that the Petition is timely and that

2    Petitioner properly exhausted both of his claims in state court.  (Doc. No. 14 at 2.)

3        On January 8, 2016, upon consent of all parties, the Honorable Cynthia A.

4    Bashant, United States District Judge, referred this case to the undersigned to conduct

5    all proceedings and order entry of a final judgment.  (Doc. No. 16.)  This Court has

6    considered the Petition, Respondent's Answer, and all supporting documents submitted

7    by the parties.  Based upon the documents and evidence presented in this case, and for

8    the reasons set forth below, the Court hereby **DENIES** the Petition.

9                                        **II.**

10                            <u>**FACTUAL BACKGROUND**</u>

11       This Court gives deference to state court findings of fact and presumes them to be

12   correct unless Petitioner rebuts the presumption of correctness by clear and convincing

13   evidence.  <u>See</u> 28 U.S.C. § 2254(e)(1); <u>see also</u> <u>Parke v. Raley</u>, 506 U.S. 20, 35-36 (1992)

14   (holding that findings of fact, including inferences properly drawn from these facts, are

15   entitled to statutory presumption of correctness).  The following facts are substantially

16   taken from the California Court of Appeal's opinion on Petitioner's direct appeal,

17   affirming the judgment of the trial court.  (<u>See</u> Lodgment No. 6 at 3–9.)

18   **A. <u>Prosecution Evidence</u>**

19       San Diego County Sheriff's Deputy Frank Leyva responded to a call about a house

20   party with more than 200 teenagers and underage adults drinking and smoking.  Deputy

21   Leyva and other deputies briefly staged nearby and then drove to the house.  Parked cars

22   lined the entire street.  Deputy Leyva stopped in front of the house, got out of his patrol

23   car, and approached the house.  He heard kids yelling, screaming, and partying in the

24   backyard.  He flashed his flashlight in the backyard and the partygoers scattered.  As

25   they scattered, some of them remarked, "F-k you[].  F-k the cops."

26       About 20 to 30 minutes later, the partygoers began leaving in mass while

27   continually calling out, "F--k you.  F--k you pigs."  Deputy Leyva started directing traffic

28                                        2

                                                              14-CV-2837

1    in front of the house.  While he was doing so, a young man shouted from the driveway,

2    "F-k you, f-k the cops."  Deputy Leyva approached the young man, who ran into the

3    backyard.  Deputies Leyva and Dylan Haddad followed him.  There they saw Petitioner

4    yelling at Deputy Jessica Charles.  Deputy Charles asked Petitioner if he was the

5    homeowner because he appeared to be the oldest person at the party.  She also asked him

6    why he was the only adult at a high school party.  Petitioner responded, "You are a c-t."

7    She told him he was "being worthless" and walked away with a man she had previously

8    detained for throwing a beer bottle at her feet and saying, "F you.  Get away from me.

9    It's my f'in house."

10   Deputy Haddad approached Petitioner after hearing his remark to Deputy Charles.

11   Petitioner said, "F--k you, pigs.  Go get a donut."  Petitioner's eyes were bloodshot, his

12   speech was slurred, and Deputy Haddad could smell alcohol on him from five feet away.

13   Petitioner turned and walked into his basement apartment, slamming the door shut

14   behind him.  He yelled something like, "F-k you guys.  Kick the door in.  You already

15   gave me a $500 ticket."

16   Deputy Leyva resumed directing traffic in front of the house.  A short while later, a

17   car drove up.  Deputy Leyva stopped the car about 25 yards from the house.  The driver

18   said she was Petitioner's girlfriend and was going to Petitioner's home.  About then,

19   Petitioner, who was six feet tall and weighed about 180 pounds, jogged toward Deputy

20   Leyva, yelling and screaming, "F-k you.  That's my f--king girlfriend.  She will park

21   wherever the f-k she wants."  Deputy Leyva could smell alcohol on Petitioner.

22   Petitioner pointed his right hand at Deputy Leyva who could see something white

23   in it, but did not know what the object was and did not know whether Petitioner was

24   armed.  Deputy Leyva commanded Petitioner to stop three times.  Petitioner did not

25   acknowledge or comply with these commands.  Instead, he continued to yell statements

26   like, "[F]--k you, f--k off, that's my f--king girlfriend.  She can park wherever the f--k

27   she wants.  Let her go.  She hasn't done anything."

28

14-CV-2837

1    Deputy Leyva thought he would have to move to avoid being trampled, but
2    Petitioner slowed to a walk as he neared Deputy Leyva.  Intending to detain Petitioner
3    for failing to listen to him and to get him out of the street, Deputy Leyva reached for
4    Petitioner's raised hand and told him to put his hands behind his back.  However, before
5    Deputy Leyva could get a solid grip on Petitioner's hand, Petitioner pulled away.  Deputy
6    Leyva did not know whether Petitioner would try to strike, punch, or tackle him.  Deputy
7    Leyva stepped aside, grabbed Petitioner's shirt or arm, and pushed Petitioner forward.
8    Petitioner ended up on the hood of his girlfriend's car.  Deputy Leyva told Petitioner to
9    put his hands behind his back.  When Petitioner did not comply, Deputy Leyva reached
10   for Petitioner's right wrist.   As Deputy Leyva did so, Petitioner tucked his arms
11   underneath himself trapping Deputy Leyva's right hand in the process.

12   Deputy Leyva felt vulnerable because he did not know Petitioner or his girlfriend
13   and his girlfriend's car was running.  Deputy Leyva grabbed Petitioner with his left hand,
14   pulled Petitioner off the hood, and tossed him into the street.   Their feet became
15   entangled and Deputy Leyva, who was 5 feet 10 inches tall and weighed approximately
16   275 pounds with his vest, belt, and other equipment on, fell on top of Petitioner on the
17   asphalt.  Deputy Leyva's right hand remained trapped underneath Petitioner.  Although
18   Deputy Leyva was eventually able to free his right hand, Petitioner continued to ignore
19   Deputy Leyva's verbal commands to stop resisting and to put his arms behind his back.

20   Deputy Haddad saw Deputy Leyva struggling with Petitioner and ran to assist.
21   Petitioner was lying face down with his hands under his body, swinging his arms in a
22   forceful manner and thrashing his body.  Deputy Haddad, who was 5 feet 6 inches tall
23   and weighed about 160 pounds, kneeled on Petitioner's left side and delivered two knee
24   strikes.  Petitioner continued moving his head from left to right and attempted to stand
25   up.  Deputy Haddad pushed him back to the ground.  Petitioner ignored the deputies'
26   commands to stop resisting and show his hands, and they still did not know then whether
27   he had any weapons.

28

4

At some point, Deputy Leyva punched Petitioner in the shoulder and was able to get Petitioner's left hand behind his back. Deputy Leyva removed an object from Petitioner's hand and tossed it to the side. A third deputy struck Petitioner's shoulder blade with a flashlight to get Petitioner to move his right hand from under his stomach to behind his back. When the flashlight strikes were unsuccessful, the deputy stunned Petitioner with an electroshock weapon.

After the deputies handcuffed Petitioner and rolled him over, Deputy Leyva noticed Petitioner's forehead was bleeding. Deputies Leyva and Haddad walked Petitioner to the patrol car and, when they reached it, Petitioner tensed up, pushed off the back of the car, and slammed his body into Deputy Haddad. Deputy Haddad gave Petitioner's left thigh two knee strikes and Petitioner got into the car.

Deputy Haddad drove Petitioner to the hospital, where hospital staff used staples to close an approximately one-inch laceration on Petitioner's forehead. Deputy Leyva only sustained a minor cut on one of his fingers. Deputy Leyva described Petitioner's level of resistance that night as an eight on a scale of one to ten, with ten being the highest.

A neighbor saw Petitioner handcuffed in the driveway, heard the deputies repeatedly ask him to stay on the ground, and saw him repeatedly trying to get up. The neighbor also heard Petitioner yelling for his girlfriend to "videotape this." Nothing about the deputies' behavior caused the neighbor to want to complain about them.

The teenage party hostess saw Petitioner running toward his girlfriend's car with a red camcorder and throw it in the car. The hostess did not see overly forceful conduct by the deputies toward the partygoers.

14-CV-2837

1    When Petitioner returned home the next day, he told the hostess he was going to

2    sue her and her parents and asked her to pay his bail.  He also asked her to provide a

3    statement and to find three friends who would write statements indicating the deputies

4    attacked him and he did not assault a deputy.  He told her it would be better if her friends

5    did not know him, it did not matter whether they attended the party, and they would not

6    have to testify in court.

7    A sheriff's lieutenant testified as an expert in the use of force.  He explained what

8    the phrase "use of force" meant and some of the force options available to deputies,

9    depending on the circumstances.  In response to hypothetical questions mirroring the

10    facts of this case, he opined the deputies' escalating use of force was reasonable.

11    **B. <u>Defense Evidence</u>**

12    Petitioner testified that he spoke with two deputies at the party and told them he

13    lived at the home.  When one of the deputies commented that he looked too old for the

14    party, Petitioner responded that he was not part of the party and went back to his

15    apartment, which was on the lower level in the rear of the house.  As he was entering the

16    apartment, he encountered Deputy Leyva, who asked him who he was and what he was

17    doing.  He ignored Deputy Leyva because he had already spoken with another deputy

18    and did not feel he could be of further assistance.  After entering his apartment, he shut,

19    not slammed, the door behind him.  He then talked on the phone with his girlfriend.

20    When his girlfriend told him she was coming up the street, Petitioner told her he

21    would meet her.  He walked to a neighbor's driveway and saw her in her car answering

22    Deputy Leyva's questions.  Because her English was not "real good," Petitioner put his

23    hand up, pointed to the car, and said, "Officer, that's my girlfriend."  "Can I help her

24    park her car?"  Deputy Leyva asked him, "Who are you?"  Petitioner replied, "I'm the

25    guy who lives down in the back of the house."  Deputy Leyva responded, "Oh.  Come

26    out here.  I can't see you."

27

28

14-CV-2837

Petitioner walked toward his girlfriend's car.  He did not have anything in his hands.
Petitioner met Deputy Leyva in front of the car and Deputy Leyva grabbed his right
wrist, twisted him around, and pushed him onto the hood.  Petitioner asked Deputy
Leyva, "Why are you doing this to me?  I didn't do anything wrong?"  As Deputy Leyva
elbowed Petitioner in the back and started handcuffing Petitioner, Deputy Leyva
responded, "I'll teach you to slam the door in my face."  Petitioner denied spitting,
swearing, or trying to kick Deputy Leyva, but acknowledged that he probably squirmed
to readjust the handcuffs.

Deputy Leyva moved Petitioner from the hood of the car to the ground.  Deputy
Leyva then sat on Petitioner, and hit Petitioner's back and shoulders with his fist.  Deputy
Leyva or a second officer hit Petitioner's head and shoulders with a flashlight.  Petitioner
then received 15 seconds of electric shock to his side.  Petitioner screamed, "I'm still,"
four times before the deputies stopped.  He felt like he had almost been killed.

Two of the deputies picked him up and carried him to a patrol car because he could
not stand up.  When they got to the car, they hit his knees a few times and then threw
him into the back of the car.

Petitioner said he had had a couple of beers that evening, but he was not drunk.  He
denied asking the teenage party hostess to find people to fabricate statements, but he
admitted asking her for bail money.  He believed she was responsible for what had
happened to him because she hosted the party.

Petitioner's girlfriend also testified and essentially corroborated Petitioner's version
of events.  She estimated that the deputies hit Petitioner between 25 and 30 times.  She
did not see Petitioner spit at, punch, hit, or kick the deputies at any time.
(Lodgment No. 6 at 2–8.)

14-CV-2837

1

2

## III.

## __PROCEDURAL HISTORY__

Petitioner is currently serving three years of formal probation after a jury convicted him of one count of felony resisting an executive officer (count 1, Cal. Penal Code § 69), and one count of misdemeanor resisting an officer (count 2, Cal. Penal Code § 148(a)(1)).  (Lodgment 2 at 94-95, 144.)

On December 4, 2013, Petitioner filed a direct appeal in the California Court of Appeal, Fourth District, Division One claiming that (1) there was insufficient evidence to convict him of the felony charge, (2) the trial court committed instructional error under state law, and (3) the trial court abused its discretion in denying Petitioner's motion to reduce his felony conviction to a misdemeanor.  (Lodgments 3, 4, 5.)  On August 5, 2014, the appellate court affirmed the superior court's judgment in a written decision. (Lodgment 6.)

Petitioner sought review from the California Supreme Court raising the same claims.  (Lodgment 7.)  On October 15, 2014, the state supreme court denied review. (Lodgment 8.)   In his instant Petition, Petitioner again raises the first two claims described above.

## IV.

## __STANDARD OF REVIEW__

This Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") because it was filed after April 24, 1996, and Petitioner is in custody pursuant to the judgment of a state court. See Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under AEDPA, a court may not grant a habeas petition "with respect to any claim that was adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), unless the state court's judgment "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on

14-CV-2837

an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

A federal habeas court may grant relief under the "contrary to" clause "if 'the state court applies a rule that contradicts the governing law set forth in Supreme Court cases.'" Andrews v. Davis, 798 F.3d 759, 774 (9th Cir. 2015) (quoting Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. See Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). However, "an unreasonable application of Supreme Court precedent is not one that is merely 'incorrect or erroneous' [citation omitted], rather, 'the pivotal question is whether the state court's application of the relevant Supreme Court precedent was *unreasonable*.'" Andrews, 798 F.3d at 774 (quoting Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) and Harrington v. Richter, 562 U.S. 86, 101, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011)) (emphasis in original). Precedent is not "clearly established" law under section 2254(d)(1) "unless it 'squarely addresses the issue' in the case before the state court [citation omitted] or 'establishes a legal principal that clearly extends' to the case before the state court." Id. at 773 (quoting Wright v. Van Patten, 552 U.S. 120, 125-26, 128 S.Ct. 743, 169 L.Ed.2d 583 (2008); Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2008)).

In deciding a habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination. Rather, Section 2254(d) "sets forth a 'highly deferential standard, which demands that state-court decisions be given the benefit of the doubt.'" Id. at 774 (quoting Cullen v. Pinholster, 563 U.S. 170, 1398, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011)). While not a complete bar on the relitigation of claims already rejected in state court proceedings, Section 2254(d) merely "'preserves authority to issue the writ in cases where there is no possibility fairminded jurists could

9

1    disagree that the state court's decision conflicts with [Supreme Court precedent]' and

2    'goes no further.'" Id. (quoting Richter, 562 U.S. at 102).

3          Where there is no reasoned decision from the highest state court to which the

4    claim was presented, the court "looks through" to the last reasoned state court decision

5    and presumes it provides the basis for the higher court's denial of a claim or claims.  See

6    Ylst v. Nunnemaker, 501 U.S. 797, 805-06, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991);

7    Cannedy v. Adams, 706 F.3d 1148, 1156 (9th Cir. 2013), *as amended on denial of*

8    *rehearing*, 733 F.3d 794 (9th Cir. 2013), *cert. denied*, − U.S. −, 134 S.Ct. 1001, 187

9    L.Ed.2d 863 (2014). If the dispositive state court does not furnish an explanation for its

10   decision, a federal habeas court must "engage in an independent review of the record

11   and ascertain whether the state court's decision was objectively unreasonable." Murray

12   v. Schriro, 745 F.3d 984, 996 (9th Cir. 2014).  However, a state court need not cite

13   Supreme Court precedent when resolving a habeas corpus claim.  See Early v. Packer,

14   537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002). "[S]o long as neither the reasoning

15   nor the result of the state-court decision contradicts [Supreme Court precedent,]" the

16   state court decision will not be "contrary to" clearly established federal law.  Id.  Clearly

17   established federal law, for purposes of Section 2254(d), means "the governing principle

18   or principles set forth by the Supreme Court at the time the state court renders its

19   decision." Andrade, 538 U.S. at 72. Ninth Circuit cases may be persuasive authority for

20   purposes of determining whether a particular state court decision is an unreasonable

21   application of Supreme Court law and may be relevant to determining what Supreme

22   Court law is clearly established. See Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir.

23   2000).

24

25

26

27

28                                          10

14-CV-2837

1

## V.

## DISCUSSION

Petitioner's two grounds for relief are as follows: (1) the trial court prejudicially erred by failing to *sua sponte* instruct the jury on what constitutes a lawful detention and arrest; and (2) his Fourteenth Amendment right to due process was violated because there was insufficient evidence to convict him of the felony offense of resisting an executive officer. (Doc. No. 4 at 6-7.)

Respondents argue that the California Court of Appeal reasonably rejected both of Petitioner's claims. (Doc. No. 14 at 2.) They argue that Petitioner's instructional error claim involves a state court's application of state law and, therefore, does not present an issue for federal review. (Doc. No. 14 at 2; citing Bradshaw v. Richey, 546 U.S. 74, 76 (2005).) Respondents also contend that, even assuming that the trial court erred, Petitioner is not entitled to habeas relief on the instructional error claim because his trial and resulting sentence were fair. (Doc. No. 14 at 2.) As for his insufficient evidence claim, Respondents assert that Petitioner is not entitled to habeas relief because the state court's decision was neither contrary to, nor an unreasonable application of, clearly established United States Supreme Court precedent. (Doc. No. 14-1 at 19.)

### A. Jury Instruction

Instructional error warrants federal habeas relief only if the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." Waddington v. Sarausad, 555 U.S. 179, 191 (2009); Middleton v. McNeil, 541 U.S. 433, 437 (2004) (per curiam). The instruction must be more than merely erroneous; rather, a petitioner must show there was a "reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." McNeil, 541 U.S. at 437 (citations and internal quotation marks omitted); Sarausad, 555 U.S. at 190–91; see also Cupp v. Naughten, 414 U.S. 141, 146 (1973) ("Before a federal court may overturn a conviction resulting from a state trial in which [an allegedly faulty] instruction was used,

11

14-CV-2837

it must be established not merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.").  Further, "[i]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle v. McGuire, 502 U.S. 62, 72 (1991) (citation omitted); Sarausad, 555 U.S. at 191.  Moreover, if a constitutional error occurred, federal habeas relief remains unwarranted unless the error caused prejudice, *i.e.,* unless it had a substantial and injurious effect or influence in determining the jury's verdict. Hedgpeth v. Pulido, 555 U.S. 57, 58 (2008) (per curiam) (citing Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).

In his first claim, Petitioner alleges that the trial court prejudicially erred when it failed to *sua sponte* instruct the jury with two specific sections of CALCRIM No. 2670, "Lawful Performance: Peace Officer."  (Doc. No. 4 at 6.)  Those two specific sections of CALCRIM No. 2670 elaborate on what constitutes a lawful detention and arrest.  Respondents contend that alleged state law error does not provide a basis for habeas relief, and that the jury was instructed in a manner consistent with Constitutional requirements.  (Doc. No. 14-1 at 12–13.)

### 1. California Court of Appeal's Opinion

The California Court of Appeal rejected Petitioner's instructional error claim, concluding:

> While there were allusions during the trial to Deputy Leyva's actions possibly amounting to an unlawful detention and/or arrest, the indisputable focus of the trial was on whether Deputy Leyva and the other deputies used excessive force against Petitioner.  Assuming, without deciding, the court should have nonetheless instructed the jury with the sections of CALCRIM No. 2670 addressing unlawful detention and arrest, we conclude any error was harmless under both the state miscarriage of justice standard (People v. Watson (1956) 46

12

14-CV-2837

Cal.2d 818, 836-837) and the federal harmless beyond a reasonable doubt standard (<u>Chapman v. California</u> (1967) 386 U.S. 18, 24).

The jury knew from the instructions given it had to find Petitioner not guilty if Deputy Leyva had unlawfully detained or arrested Petitioner. Although the court did not elaborate on what constituted an unlawful detention or arrest, the parties' presentation of diametrically opposing versions of events precluded the jury from finding for Petitioner under either theory unless the jury credited Petitioner's version of events. The jury necessarily rejected Petitioner's version of events when the jury rejected the theory the deputies acted with excessive force. Accordingly, we conclude both that it is not reasonably probable Petitioner would have obtained a more favorable result absent the claimed error and that the record establishes beyond a reasonable doubt the claimed error did not contribute to the guilty verdict. (<u>See</u> <u>People v. Flood</u> (1998) 18 Cal.4th 470, 505.)

(Lodgment 6 at 15–16.)

### 2. **Analysis**

Petitioner was convicted of felony resisting an executive officer pursuant to California Penal Code Section 69. Section 69 sets forth two separate ways in which an offense can be committed. Cal. Penal Code § 69. The first way of violating Section 69 encompasses attempts to deter either an officer's immediate performance of a duty imposed by law or the officer's performance of such a duty at some time in the future. <u>People v. Smith</u>, 57 Cal.4th 232, 240 (2013). The second way of violating Section 69 expressly requires that the defendant resist the officer "by the use of force or violence," and it further requires that the officer was acting lawfully at the time of the offense. <u>Smith</u>, 57 Cal.4th at 241. Here, both parties agree that the jury convicted Petitioner under the second theory, resisting an officer by force. (Lodgment 6 at 11.)

At Petitioner's trial, the court instructed the jury with CALCRIM No. 2652, "Resisting an Executive Officer in Performance of Duty," and stated that the crime of felony resisting an executive officer required proof that "[w]hen the defendant acted, the

14-CV-2837

officer was performing his lawful duty." (Doc. No. 15-3 at 192, 3 RT 454.)  The court
elaborated by instructing[1] that:

> [a] peace officer is not lawfully performing his or her duties if he
> or she is unlawfully arresting or detaining someone or using
> unreasonable or excessive force in his or her duties.  Instruction 2670
> explains when an arrest or detention is unlawful and when force is
> unreasonable or excessive.

(Doc. No. 15-3 at 193, 3 RT 455, citing CALCRIM No. 2652.)

The court used a modified version of CALCRIM No. 2670 to instruct the jury on
excessive force, stating:

> The People have the burden of proving beyond a reasonable
> doubt that Leyva, Haddad and Boisseranc were lawfully performing
> their duties as peace officers.  If the People have not met this burden,
> you must find the defendant not guilty of resisting an executive officer
> or resisting a peace officer.
>
> A peace officer is not lawfully performing his or her duties if he
> or she is unlawfully arresting or detaining someone or using
> unreasonable or excessive force when making or attempting to make an
> otherwise lawful arrest or detention.
>
> Special rules control the use of force.
>
> A peace officer may use reasonable force to arrest or detain
> someone, to prevent escape, to overcome resistance, or in self-defense.
>
> If a person knows, or reasonably should know, that a peace
> officer is arresting or detaining him or her, the person must not use force
> or any weapon to resist an officer's use of reasonable force.  However,
> you may not find the defendant guilty of resisting arrest if the arrest was

---

[1] The trial court provided substantially similar instructions on the misdemeanor crime of
resisting an officer, using CALCRIM No. 2656.  (Doc. No. 15-3 at 193–94, 3 RT 455–
56.)

14

unlawful, even if the defendant knew or reasonably should have known that the officer was arresting him.

If a peace officer uses unreasonable or excessive force while arresting or attempting to arrest or detaining or attempting to detain a person, that person may lawfully use reasonable force to defend himself or herself.

A person being arrested uses reasonable force when he or she: (1) uses that degree of force that he or she actually believes is reasonably necessary to protect himself or herself from the officer's use of unreasonable or excessive force; and (2) uses no more force than a reasonable person in the same situation would believe is necessary for his or her protection.

(Doc. No. 15-3 at 195–96, 3 RT 457-458.)

The court also instructed the jury with CALCRIM No. 2672, "Lawful Performance: Unlawful Arrest With Force," stating:

The defendant is not guilty of the crime of resisting an executive officer or resisting a peace officer if the officer was not lawfully performing his duties because he was unlawfully arresting someone.

However, even if the arrest was unlawful, as long as the officer used only reasonable force to accomplish the arrest, the defendant may be guilty of the lesser crime of battery or assault.

On the other hand, if the officer used unreasonable or excessive force, and the defendant used only reasonable force in self-defense, then the defendant is not guilty of the lesser crimes of battery or assault.

The People have the burden of proving beyond a reasonable doubt that the officer was lawfully performing his duties. If the People have not met this burden, you must find the defendant not guilty of resisting an executive officer or resisting a peace officer.

(Doc. No. 15-3 at 196–97, 3 RT 458-459.)

15

14-CV-2837

The court also instructed the jury that, "[t]he duties of a peace officer include responding to dispatch calls regarding noise complaints, crowd control, and keeping the peace." CALCRIM No. 2656, "Resisting a Peace Officer; Doc. No. 15-3 at 193, 3 RT 455.

At issue in this Petition is the trial court's adaptation of CALCRIM No. 2670, which omitted Section A, "Unlawful Detention," and Section B, "Unlawful Arrest." Section A states: "A peace officer may legally detain someone if [the person consents to the detention or if]: 1. Specific facts known or apparent to the officer lead him or her to suspect that the person to be detained has been, is, or is about to be involved in activity relating to crime; AND 2. A reasonable officer who knew the same facts would have the same suspicion. Any other detention is unlawful. In deciding whether the detention was lawful, consider evidence of the officer's training and experience and all the circumstances known by the officer when he or she detained the person." CALCRIM No. 2670.

Section B states: "A peace officer may legally arrest someone [either] (on the basis of an arrest warrant/ [or] if he or she has probable cause to make the arrest). Any other arrest is unlawful. Probable cause exists when the facts known to the arresting officer at the time of the arrest would persuade someone of reasonable caution that the person to be arrested has committed a crime. In deciding whether the arrest was lawful, consider evidence of the officer's training and experience and all the circumstances known by the officer when he or she arrested the person." CALCRIM No. 2670.

The bench notes for CALCRIM No. 2670 state that a court should include Section A in its jury instructions "if there is an issue as to whether the officer had a legal basis to detain someone," and Section B should be included "if there is an issue as to whether the officer had a legal basis to arrest someone." CALCRIM No. 2670, Bench Notes.

Although neither party specifically requested that the court instruct the jury with Sections A and B of CALCRIM No. 2670, Petitioner contends that the court

14-CV-2837

1   prejudicially erred by failing to do so *sua sponte*.[2]  (Doc. No. 4 at 6.)  " 'It is settled that

2   in criminal cases, even in the absence of a request, the trial court must instruct on the

3   general principles of law relevant to the issues raised by the evidence…The general

4   principles of law governing the case are those principles closely and openly connected

5   with the facts before the court, and which are necessary for the jury's understanding of

6   the case.' "  People v. Smith, 57 Cal.4th at 239, quoting People v. St. Martin, 1 Cal.3d

7   524, 531 (1970).

8        Under California law, " 'when a statute makes it a crime to commit any act against

9   a peace officer engaged in the performance of his or her duties, part of the corpus delicti

10  of the offense is that the officer was acting lawfully at the time the offense was

11  committed.' "  People v. Cruz, 44 Cal.4th 636, 673 (2008), quoting People v. Jenkins,

12  22 Cal.4th 900, 1020 (2000).  A trial court is required to *sua sponte* instruct the jury on

13  this issue if there is sufficient evidence that the officer was not lawfully performing his

14  or her duties.  People v. Olguin, 119 Cal.App.3d 39, 46 (1981); White, 101 Cal.App.3d

15  at 167; see also CALCRIM No. 2670, Bench Notes ("The court has a *sua sponte* duty to

16  give this instruction if there is sufficient evidence that the officer was not lawfully

17  performing his or her duties and lawful performance is an element of the offense.").

18       The state appellate court chose not to decide whether the trial court erred by failing

19  to instruct the jury with Sections A and B of CALCRIM No. 2670.  However, the

20  appellate court concluded that any error was harmless beyond a reasonable doubt

21  because the jury knew from the instructions given that it must find Petitioner not guilty

22  if Deputy Leyva had unlawfully detained or arrested him.  (Lodgment 6 at 16.)  The

23  appellate court also noted that there were "allusions" during the trial to Deputy Leyva's

24

---

25  [2] Petitioner does not use the phrase "*sua sponte*" when stating his claim in his Petition,
    but the state appellate court framed Petitioner's claim as, "the court prejudicially erred

26  by failing to *sua sponte* instruct the jury on what constitutes a lawful detention and
    arrest" (Lodgment 6 at 3), and Respondents frame Petitioner's claim in their Answer as

27  the trial court's failure to *sua sponte* instruct.  (Doc. No. 14-1 at 12.)

28

14-CV-2837

1    actions possibly amounting to an unlawful detention or arrest, but that the "indisputable

2    focus" of the trial was whether or not the deputies used excessive force against

3    Petitioner.

4         This Court agrees with the California Court of Appeal that, if the trial court did

5    err by failing to instruct the jury with Sections A and B of CALCRIM No. 2670, any

6    error was harmless.  Considering, as it must, the omission of the two jury instruction

7    sections in the context of the instructions as a whole, the Court finds that any error did

8    not rise to the level of a constitutional violation.  See Estelle, 502 U.S. at 72; see also

9    Sarausad, 555 U.S. at 191.  The instructions given were clear that the prosecution had

10   the burden of proving beyond a reasonable doubt that the deputies were lawfully

11   performing their duties as peace officers, and if the prosecution failed to meet that

12   burden, Petitioner must be found not guilty of both the felony and misdemeanor offenses.

13   CALCRIM Nos. 2652, 2670; Doc. No. 15-3 at 192–193, 195, 3 RT 454–455, 457.  The

14   jury was explicitly instructed that a peace officer is not lawfully performing his or her

15   duties if he or she is unlawfully arresting or detaining someone.  CALCRIM No. 2670;

16   Doc. No. 15-3 at 195, 3 RT 457.  Further, if the jury had rejected Petitioner's claim that

17   the officers used excessive force, but still found the detention or arrest to be unlawful,

18   the jury was instructed that it may find Petitioner guilty of the lesser crimes of battery or

19   assault.  CALCRIM No. 2672; Doc. No. 15-3 at 196, 3 RT 458.  The jury found

20   Petitioner guilty of both the felony and misdemeanor offenses involving resisting an

21   officer, thereby rejecting Petitioner's version of events regarding the officer's use of

22   force and any theories about an unlawful detention or arrest.

23        The parties' two versions of events could not be more conflicting.  At trial,

24   Petitioner presented evidence that he approached Deputy Leyva and asked if he could

25   assist his girlfriend in parking her car and, with nothing in his hand, he was suddenly

26   grabbed, twisted, and pushed by Deputy Leyva in response to ignoring the deputy during

27   an earlier encounter.  The prosecution presented evidence that Petitioner was drunk and

28

1    hysterical, and moved quickly toward Deputy Leyva with an unidentified object in his

2    hand, then resisted the deputies and ignored their commands as they tried to restrain him.

3    Evidence was presented at trial that Petitioner ran toward Deputy Leyva yelling

4    obscenities, and that Petitioner pulled away from Deputy Leyva when the deputy reached

5    for Petitioner's hand after ignoring the deputy's commands.  2 RT 77, 81, 85.  The jury

6    heard testimony that, while Deputy Leyva and Petitioner were struggling on the ground,

7    Petitioner continued to ignore the deputy's verbal commands to stop resisting.  2 RT 88.

8    The jury heard testimony from Deputy Leyva that Petitioner's resistance level was an 8

9    out of 10, with 10 being the highest.  2 RT 92.  The prosecution presented evidence that

10   when the deputies told Petitioner to turn around, he instead pushed off the back of the

11   patrol car and pushed himself into Deputy Haddad.  2 RT 95.

12          Instructional error warrants federal habeas relief only if the instruction by itself so

13   infected the entire trial that the resulting conviction violates due process.  Sarausad, 555

14   U.S. at 191; McNeil, 541 U.S. at 437.  The court of appeal noted that, although the trial

15   court did not elaborate on what constituted an unlawful detention or arrest, the parties'

16   presentation of diametrically opposing versions of events precluded the jury from

17   finding in Petitioner's favor unless the jury credited Petitioner's version of events.

18   (Lodgment 6 at 16.)  This Court agrees that the evidence at trial focused on Petitioner's

19   actions and the deputies' use of force, and that the jury was instructed about the

20   prosecution's burden of proof.  The Court finds that Petitioner has failed to show that

21   there was a reasonable likelihood that the jury applied the modified version of

22   CALCRIM No. 2670 in violation of the Constitution.  McNeil, 541 U.S. at 437.

23   Therefore, the California Supreme Court's rejection of this claim was neither contrary

24   to, nor an unreasonable application of, clearly established federal law.

25       **B.   Insufficient Evidence**

26          To review the sufficiency of the evidence in a habeas corpus proceeding, the Court

27   must determine "whether, after viewing the evidence in the light most favorable to the

28

14-CV-2837

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012) (per curiam); see also Coleman v. Johnson, 132 S.Ct. 2060, 2065 (2012) (per curiam) ("[T]he only question under Jackson is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality.").  All evidence must be considered in the light most favorable to the prosecution, Lewis v. Jeffers, 497 U.S. 764, 782 (1990); Jackson, 443 U.S. at 319, and if the facts support conflicting inferences, reviewing courts "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326; Cavazos v. Smith, 132 S.Ct. 2, 6 (2011) (per curiam).

Furthermore, under AEDPA, federal courts must "apply the standards of [Jackson] with an additional layer of deference." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.2005); Boyer v. Belleque, 659 F.3d 957, 964–65 (9th Cir.2011). These standards are applied to the substantive elements of the criminal offense under state law. Jackson, 443 U.S. at 324 n.16; Boyer, 659 F.3d at 964; see also Johnson, 132 S.Ct. at 2064 ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and quotation marks omitted)).

In his second claim, Petitioner asserts that there was insufficient evidence to convict him of the crime of felony resisting an executive officer because there was "no sufficient evidence that there was 'intent' or 'state of mind' to confront [Deputy] Leyva in a negative way." (Doc. No. 4 at 7.)  Respondents assert that there was ample evidence that Petitioner repeatedly shouted expletives at Deputy Leyva and ran at him in defiance of the deputy's repeated commands to stop. (Doc. No. 14-1 at 21; citing Lodgment 6 at 10.)  Further, Respondents argue that intending to confront an executive officer in a

negative way is not an element of Section 69.   (Doc. No. 14-1 at 21.)   Finally, Respondents contend that the state appellate court reasonably applied the standard set forth in <u>Jackson</u> and correctly determined that the evidence was sufficient to support Petitioner's felony conviction.  (Doc. No. 14-1 at 21.)

## 1. <u>California Court of Appeal's Opinion</u>

The California Court of Appeal rejected Petitioner's insufficient evidence claim, concluding:

> [T]he evidence, viewed in the light most favorable to the judgment, showed Deputy Leyva and the other deputies went to the home where [Petitioner] was living to break up an out-of-control party. While Leyva was attempting to direct traffic, which [Petitioner] does not dispute was a lawful duty, [Petitioner] jogged toward him shouting expletives. [Petitioner] carried an unknown object in his right hand, which he had pointed at Leyva, and he ignored Leyva's repeated commands to stop. When [Petitioner] neared Leyva, Leyva attempted to detain [Petitioner] and commanded [Petitioner] to put his hands behind his back. Instead of complying with Leyva's command, [Petitioner] put his hands underneath his torso and trapped one of Deputy Leyva's hands on the hood of a running vehicle. [Petitioner] thrashed about and continued resisting Leyva's commands despite receiving fist strikes, flashlight strikes, and knee strikes. He did not initially stop resisting until a deputy administered electric shocks.  He then resumed resisting when deputies tried to place him in a patrol car until he received two knee strikes. Collectively, this evidence supports his conviction for violating [S]ection 69. (<u>See People v. Bernal</u> (2013) 222 Cal.App.4th 512, 518-519; <u>People v. Carrasco</u> (2008) 163 Cal.App.4th 978, 985-986.)
>
> The existence of conflicting evidence favorable to [Petitioner] does not alter our conclusion. " ' "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither

14-CV-2837

credibility issues nor evidentiary conflicts; we look for substantial evidence." ' "  (People v. Manibusan, supra, 58 Cal.4th at p. 87.) As there is substantial evidence to support [Petitioner's] felony conviction in the record before us, we conclude he has not established the conviction should be reversed on this ground.

### 2. Analysis

Section 69 makes it a felony for any person (1) to attempt, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or (2) to knowingly resist, by the use of force or violence, such officer, in the performance of his duty.  Cal. Penal Code § 69.  "The statute sets forth two separate ways in which an offense can be committed. The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law; the second is resisting by force or violence an officer in the performance of his or her duty."  In re Manuel G., 16 Cal.4th 805, 814 (1997).  These two types of offenses have different elements.  People v. Lopez, 129 Cal.App.4th 1508, 1530 (2005).  Notably, although the first type of offense—attempt—requires a specific intent to deter or prevent the officer from performing a lawful duty, the second type of offense—resistance—only requires that the defendant knowingly perform an act of resistance.  Id; People v. Rasmussen, 189 Cal.App.4th 1411, 1419 (2010) ("The resistance prong of section 69 involves a defendant who 'knowingly' resists an executive officer.  'The word "knowingly" imports only a knowledge that the facts exist which bring the act or omission within the provisions of this code.  It does not require any knowledge of the unlawfulness of such act or omission.") (internal citations omitted).  Thus, because the definition of the resistance type of offense in Section 69 describes only the act of resisting an executive officer and does not require an intent to do a further act or achieve a future consequence, it is a general intent crime.  Rasmussen, 189 Cal.App.4th at 1419–20.

14-CV-2837

1       As previously stated, both parties agree that the jury convicted Petitioner under the

2   second theory of Section 69.  The trial court instructed the jury with CALCRIM No.

3   2652, stating that the offense of violating Section 69 requires proof of the following three

4   elements: (1) the defendant unlawfully used force or violence to resist an executive

5   officer; (2) when the defendant acted, the officer was performing his lawful duty; and

6   (3) when the defendant acted, he knew the executive officer was performing his duty.

7   (3 RT 454; CALCRIM No. 2652.)

8       Petitioner contends that there was insufficient evidence to support his felony

9   conviction under Section 69 because the prosecution did not prove that he intended to

10   confront Deputy Leyva in a negative way.  (Doc. No. 4 at 7.)  To support his argument,

11   Petitioner cites the prosecution's statement during trial that Petitioner attacked the

12   deputies "for whatever reason."  (Doc. No. 4 at 7.)  Petitioner asserts that he was trying

13   to assist Deputy Leyva in identifying his girlfriend and asked if he could help park her

14   car.  (Doc. No. 4 at 7.)  He claims that Deputy Leyva already knew that he was going to

15   arrest Petitioner when he saw him, as Deputy Leyva was upset that Petitioner had

16   avoided him earlier that evening.  (Doc. No. 4 at 7.)

17       This Court agrees with the California Court of Appeal that the jury was presented

18   with sufficient evidence to convict Petitioner of resisting an executive officer.  As to the

19   first element of Section 69, that Petitioner unlawfully used force or violence to resist an

20   executive officer, the jury heard evidence that Petitioner ran toward Deputy Leyva

21   yelling obscenities with an unidentified object in his hand, and that he did not respond

22   to the deputy's repeated commands to stop.  (2 RT 77, 81.)  Petitioner pulled away from

23   Deputy Leyva when the deputy reached for Petitioner's hand after ignoring the deputy's

24   commands.  (2 RT 85–86.)  When Deputy Leyva grabbed Petitioner, pushed him onto

25   the hood of his girlfriend's car, and reached for Petitioner's wrist, Petitioner tucked his

26   arms underneath himself, pinching the deputy's hand between Petitioner's bicep and rib

27   cage.  (2 RT 86–88.)  While Deputy Leyva and Petitioner were struggling on the ground,

28

14-CV-2837

Petitioner continued to ignore the deputy's verbal commands to stop resisting.  (2 RT 88.)  When Deputy Haddad came to assist, Petitioner, with his hands still tucked under his body, swung his arms in a forceful manner, thrashing his body from left to right on the ground.  (2 RT 89–90, 113–115, 165–166.)  Deputy Haddad kneeled on Petitioner's left side and Petitioner continued to move his arms towards Deputy Leyva.  (2 RT 165–167.)  Deputy Haddad delivered two knee strikes to Petitioner's left side, and Petitioner continued to resist.  (2 RT 165–167.)  Petitioner moved his head from left to right and attempted to stand by pushing back.  (2 RT 167–168.)  When trying to get Petitioner into the patrol car, the deputies told him to turn around and he pushed off the back of the patrol car and pushed himself into Deputy Haddad.  (2 RT 95.)  Deputy Leyva testified that he considered Petitioner's resistance level to be an 8 out of 10, with 10 being the highest.  (2 RT 92.)  This evidence is sufficient to establish that Petitioner forcefully resisted the deputies' attempts to restrain him.

Petitioner's assertion that the prosecution had to prove his intent or motive in order to convict him of the felony offense, is misplaced.  Respondents are correct that intending to confront an officer in a negative way is not an element of Section 69, and thus, the prosecution was not required to present any evidence to demonstrate Petitioner's state of mind or motive.  The prosecution was only required to prove that Petitioner knowingly resisted the deputies, as this is a general intent crime.  Cal. Penal Code § 69; Rasmussen, 189 Ca.App.4th at 1419-20; Flores-Lopez v. Holder, 685 F.3d 857, 864 (9th Cir. 2012); People v. Davis, 10 Cal.4th 463, 518–519, fn. 15 (1995) ("A crime is characterized as a 'general intent' crime when the required mental state entails only an intent to do the act that causes the harm...")

In preliminary instructions and again in the instructions given before closing arguments, the trial court told the jury that both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state, and acts necessary to a conviction, and neither is necessarily

14-CV-2837

1   more reliable than the other.  (2 RT 25, 31; 3 RT 443, 448.)  The trial court instructed

2   the jury that neither type of evidence is entitled to any greater weight than the other.  (2

3   RT 25, 31; 3 RT 443, 448.)

4          The circumstantial evidence was sufficient to show that Petitioner knowingly

5   resisted the deputies.  Moreover, even though the prosecution was not required to prove

6   intent, Petitioner's intent to resist Deputies Leyva and Haddad, and his intent to confront

7   Deputy Leyva in a negative way, may be inferred from the evidence that Petitioner ran

8   toward Deputy Leyva yelling obscenities with an unidentified object in his hand, failed

9   to respond to repeated commands to stop, pulled away from Deputy Leyva and tucked

10  the deputy's arms underneath himself, swung his arms in a forceful manner, and thrashed

11  his body around while the deputies were trying to restrain him, all while continuing to

12  ignore their repeated commands to stop resisting.  (2 RT 77, 81, 85–90, 113–115, 165–

13  166.)  The jury also heard that Petitioner pushed off the back of the patrol car and pushed

14  himself into Deputy Haddad when the deputies were trying to get him into the car.  (2

15  RT 95.)   The jury was presented with sufficient evidence to infer that Petitioner's

16  behavior was not accidental, unintended, or inadvertent.  Not only does this evidence

17  support the unnecessary determination that Petitioner intended to confront Deputy Leyva

18  in a negative way, but more importantly, it also supports a determination that Petitioner

19  knowingly resisted the officers, one of the elements of the convicted offense.

20         As to the second element of Section 69, that when Petitioner acted, the officer was

21  performing his lawful duty, the trial court instructed the jury that the duties of a peace

22  officer include responding to dispatch calls regarding noise complaints, crowd control,

23  and keeping the peace.  (3 RT 455.)  The court also instructed the jury that a peace officer

24  is not lawfully performing his or her duties if he or she is unlawfully arresting or

25  detaining someone or using unreasonable or excessive force in his or her duties.  (3 RT

26  456.)   The prosecution presented evidence that the deputies were responding to a

27  dispatch call about a party at Petitioner's residence with about 200 students in

28

14-CV-2837

1   attendance. (2 RT 53.) Deputies Leyva, Haddad, and Charles testified as to their duties

2   when responding to that noise complaint, and explained how they approached the

3   residence and contacted individuals at the party. (2 RT 53–71, 154–155, 187–190.)

4   Deputy Leyva was directing traffic at the time that Petitioner came running toward him.

5   (2 RT 77.) Petitioner ran down the hill toward Deputy Leyva, pointing at the deputy and

6   yelling obscenities. (2 RT 77, 80, 226.) Deputy Leyva saw something white in

7   Petitioner's hand as he approached, and did not know if Petitioner was armed. (2 RT

8   80.) Deputy Leyva repeatedly ordered Petitioner to stop, but Petitioner ignored the

9   deputy's commands and instead continued to curse at Deputy Leyva. (2 RT 81–82.)

10  Petitioner slowed to a walk when he came within arms' reach of Deputy Leyva, but

11  pulled his arm away from the deputy before he could get a solid grip on it. (2 RT 83–

12  85.) This evidence is sufficient to establish that when Petitioner acted, Deputy Leyva

13  was performing his lawful duty.

14          Finally, as to the third element of Section 69, that when Petitioner acted, he knew

15  the executive officer was performing his duty, the prosecution put forth evidence that

16  there was a large party at Petitioner's residence and Petitioner had an interaction with

17  Deputy Charles in the backyard of the residence. (2 RT 53, 73–75, 155–157, 191–194.)

18  The deputies were managing the crowd and directing traffic. (2 RT 66, 68–69, 71, 77.)

19  Deputy Leyva was directing traffic at the time that Petitioner came running toward him,

20  and Petitioner was yelling, "Fuck you. That's my girlfriend. She will park wherever

21  she wants." (2 RT 77, 80, 108–109, 226.) This evidence is sufficient to establish that

22  when Petitioner acted, he knew that Deputy Leyva was performing his duty.

23          Accordingly, the California Supreme Court's rejection of this claim was neither

24  contrary to, nor an unreasonable application of, clearly established federal law.

25  //

26  //

27  //

28

14-CV-2837

# VI.

## CONCLUSION

For the foregoing reasons, this Court **ORDERS** that the First Amended Petition for Writ of Habeas Corpus be **DENIED**.   The Court directs the Clerk of Court to enter Judgment dismissing this action with prejudice.

**IT IS SO ORDERED.**

Dated:  April 21, 2016

_____

Hon. William V. Gallo
United States Magistrate Judge

14-CV-2837